IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CHRISTOPHER SNEED, | ) | Case No. 5:19-CV-1422 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | THOMAS M. PARKER |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

## I.      Introduction

Plaintiff, Christopher Sneed, seeks judicial review of the final decision of the Commissioner of Social Security, denying his application for supplemental security income ("SSI") under Title XVI of the Social Security Act.  This matter is before me pursuant to 42 U.S.C. § 1383(c)(3) and the parties consented to my jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  ECF Doc. 12.  Because the Administrative Law Judge ("ALJ") applied proper legal standards and reached a decision supported by substantial evidence, the Commissioner's final decision denying Sneed's application for SSI must be AFFIRMED.

## II.     Procedural History

On September 30, 2016, Sneed protectively applied for SSI.  (Tr. 188-96).[1]  Sneed alleged that he became disabled on October 21, 2015, due to "anxiety, bipolar II disorder, depression, insomnia, ADHD, borderline intellectual disability, [and] learning disability."  (Tr.

---

[1] The administrative transcript appears in ECF Doc. 10.

97-98). The Social Security Administration denied Sneed's application initially and upon reconsideration. (Tr. 96-124). Sneed requested an administrative hearing. (Tr. 144-46). ALJ Reuben Sheperd heard Sneed's case on September 7, 2018, and denied the claim in an October 11, 2018 decision. (Tr. 1-44, 51-67). On May 7, 2019, the Appeals Council denied further review, rendering the ALJ's decision the final decision of the Commissioner. (Tr. 45-50). On June 20, 2018, Sneed filed a complaint to obtain judicial review of the Commissioner's decision. ECF Doc. 1.

III.    Evidence[2]

    A.    Personal, Educational and Vocational Evidence

Sneed was born on August 23, 1990, and he was 26 years old on the date he filed his application for SSI. (Tr. 188). Sneed had a ninth-grade education, and the ALJ determined that he had no past relevant work experience. (Tr. 10, 61).

    B.    Daily Activities Reports

On January 16, 2017, Sneed's grandmother Monica Kimbrough completed a "function report" with Sneed over the phone, and Sneed's father William Sneed ("William") completed a "function report" on February 22, 2018. (Tr. 261-68, 300-07). Kimbrough and William indicated that Sneed had problems focusing or keeping up with his tasks. (Tr. 261). In a normal day, Sneed helped his grandmother around the house, watched TV or movies, read books, and took his medications. (Tr. 262, 265, 268, 304). They indicated that Sneed had trouble sleeping and needed reminders to take showers and medications. (Tr. 263, 301-02). Sneed was able to make sandwiches, frozen meals, and cereal, but he had trouble keeping track of ingredients when cooking. (Tr. 263, 302). Sneed's household chores including mowing the lawn, raking leaves,

---

[2] Because Sneed's claims before this court do not challenge the ALJ's evaluation of his physical limitations, a discussion of Sneed's physical limitations is omitted from this opinion.

cleaning his room, taking out trash, and setting the table.  (Tr. 263, 302).  He shopped in stores and by computer for clothes, food, and movies.  (Tr. 264, 303).  He had problems paying attention and following instructions, but when he was familiar with a task, he could follow instructions better.  (Tr. 266, 305).  Sneed's father often had to prompt him to follow instructions.  (Tr. 305).

### C. Relevant Medical Evidence

On April 7, 2016, Bradly Winkert, MD, saw Sneed for a psychiatric check-up.  (Tr. 351-58).  Dr. Winkert noted that Sneed was diagnosed with bipolar disorder and ADHD.  (Tr. 351).  Sneed's mood was stable with medication (Lamictal, Wellbutrin, Celexa, Seroquel, and Ambien), but he still had some periods of depression, decreased sleep, decreased concentration, and agitation.  (Tr. 351).  Sneed told Dr. Winkert that he was unemployed and that having to register as a sex offender "damaged his life."  (Tr. 351).  In reviewing Sneed's psychiatric treatment history, Dr. Winkert noted that: (1) Sneed's grandmother reported that he had "temper tantrums" and acted like a 5 year old in January 2015; (2) Sneed reported difficulty following through with tasks at home in May, July, and September 2015; and (3) Sneed reported that he had been "doing more things around the house" in January 2016 and was "doing 'kind of good'" with treatment.  (Tr. 351-52).  Sneed reported that he had decreased motivation and limited interest after his attempt to get a job through Opportunities for Ohioans with Disabilities ("OOD") Bureau of Vocational Rehabilitation ("BVR") failed.  (Tr. 352).  On examination, Sneed had average and cooperative behavior and logical thought processes.  (Tr. 353).  He had no noted cognitive impairment or issues with attention, concentration, or memory.  (Tr. 353).  Dr. Winkert diagnosed Sneed with anxiety, episodic mood disorder, alcohol abuse in remission, and psychological stress.  (Tr. 354).  Dr. Winkert continued Sneed's medications.  (Tr. 356).  At

follow-ups on September 29 and December 22, 2016, Sneed told Dr. Winkert that he was "doing a lot better than before," including "doing more things around the house." (Tr. 360, 416). Sneed said he continued to have anxiety when around other people. (Tr. 359). Dr. Winkert did not note any changes on examination, continued Sneed's medication, and referred him for therapy. (Tr. 361-62, 364, 417, 420).

On October 26, 2016, Sneed told social worker Shandi Rothman, LISW, that he had continued anxiety when out of his house around people and issues managing chores at home. (Tr. 367). On examination, Sneed was cooperative, spoke clearly, had logical/concrete thought processes, and had an estimated borderline intelligence. (Tr. 367-68). He had impaired memory, attention, and concentration. (Tr. 368). Sneed indicated that he played videogames or watched television/movies for 3 hours per night and during the day. (Tr. 369). At a follow-up on November 14, 2016, Rothman did not note any significant changes in Sneed's condition or treatment. (Tr. 371-74).

On March 21, 2017, Sneed told therapist Ashley Anderson, SWT, that he felt "less depression and anxiety" and that his primary stressors were sleeping issues and anticipation of getting his GED. (Tr. 423). On examination, Sneed had a "more hopeful, happier" mood, logical thought processes, and no reported cognitive impairments. (Tr. 423-24). Anderson estimated that Sneed had average intelligence. (Tr. 424). Anderson also noted that Sneed had been taking "more responsibility and initiative in treatment," and was "showing more drive and initiative to meet his goals and personal well-being." (Tr. 425). On March 31, 2017, Sneed told Anderson that he continued to do better, felt progress, understood his current issues and worked on them, and wanted to start focusing on being more social and making friends. (Tr. 428, 430, 432). He again did not report any cognitive impairments. (Tr. 429).

On September 7, 2017, Rothman noted that Sneed had "average" intelligence, had logical thought processes, did not report any cognitive impairments, and had impaired attention/concentration. (Tr. 483). Sneed indicated that his depression was worse, and he struggled with medication compliance. (Tr. 485). However, Sneed said that he "felt mostly confident in being able to complete task list daily [when] tasks are broken down." (Tr. 485). At follow-ups on December 21, 2017, and January 9, 2018, Rothman noted that Sneed's condition was stable, and that he had good judgment and insight. (Tr. 487, 492). Sneed indicated that he "struggle[d] to push [him]self to actively engage in skills that have helped in the past," and that he had problems focusing, major anxiety, and depression issues. (Tr. 493-94).

On November 30, 2017, Alan Shimer, MD, noted that Sneed was off his medications over the summer of 2017, but Sneed reported that he was "doing okay." (Tr. 467). Sneed indicated that he had a childhood history of ADHD, but his last symptoms were "very long ago" and his ADHD was not a "recent issue." (Tr. 467). Sneed also indicated that he wanted to continue pursuing his GED and employment. (Tr. 471). On examination, Sneed was withdrawn and cooperative; had clear speech and logical thought processes; and had no noted cognitive impairments. (Tr. 470). Dr. Shimer diagnosed Sneed with major depressive disorder and unspecified anxiety disorder. (Tr. 470-71). At a follow-up on December 7, 2017, Dr. Shimer did not note any significant changes in Sneed's condition or treatment. (Tr. 474-81). On February 1, 2018, Sneed told Dr. Shimer that he had "anxiety with difficulties concentrating" and struggled in social situations, but Dr. Shimer did not note any cognitive impairments on mental examination. (Tr. 497, 500-01). Sneed indicated that he wanted to continue to work toward getting his GED and a job. (Tr. 503). On March 8, 2018, Sneed said he had "low energy, low

motivation, and poor concentration," but his anxiety had improved at home. (Tr. 505). Dr. Shimer again did not note any cognitive impairment on examination. (Tr. 508).

On May 15, 2018, Sneed told Dr. Shimer that he had "increased difficulty with his memory, "increase[d] forgetfulness associated with . . . fatigue," "low energy, low motivation[,] and limited ability to focus and concentrate." (Tr. 513). On examination, Sneed had a preoccupied demeanor and "mild struggles with [remembering] recent events." (Tr. 516). Sneed indicated that he wished to continue pursuing his GED and employment, and Dr. Shimer continued Sneed's medications. (Tr. 518). On June 14, 2018, Sneed told Dr. Shimer that he felt "up and down," but he was able to work on outdoors chores with his grandmother and father. (Tr. 521). He said he was afraid to try new things and wanted to be tested for Adult ADHD. (Tr. 521). He also said that  he was "a good reader," and his anxiety was low at home and around people he knew. (Tr. 521). Dr. Shimer recommended that Sneed resume counseling. (Tr. 526).

On July 26, 2018, Sneed told Dr. Shimer that he was compliant with his medications and felt "alright." (Tr. 529). He indicated that he continued to have low energy and issues with concentration, motivation, focus, attention, following through, studying, and forgetfulness. (Tr. 529). Sneed indicated that he was going to be tested for Adult ADHD. (Tr. 529). On examination, Dr. Shimer noted that Sneed had impaired memory, attention, and concentration. (Tr. 532). Sneed also indicated that he would continue pursuing his GED and employment. (Tr. 535).

### D.     Relevant Bureau of Vocational Rehabilitation Evidence

In March and May 2016, Sneed, under observation by a job coach, participated in a situational assessment and two community-based work adjustments ("CBWA") through BVR. (Tr. 219-35). Sneed's situational assessment was as a dishwasher at Goodwill, but he could not

pass a drug test.  (Tr. 210-11, 216).  Sneed's first CBWA placement was at Chili's, performing food prep, dishwashing, and outside cleanup.  (Tr. 220-22).  The job coach noted throughout the placement that Sneed worked well with his coworkers, but his pace was slow throughout all his shifts.  (Tr. 220-22).  Sneed needed frequent prompting for staying on task and following instructions, even when he had been performing a task for some time.  (Tr. 220-22).  Sneed did not show up for his last shift because he "forgot" about it.  (Tr. 221).  Sneed told his job coach that he had trouble because food service was too fast-paced, and he would do better in environments that involved less social interaction and noise.  (Tr. 222).  Although Sneed worked at a slow pace and was not efficient, he was able to meet expectations.  (Tr. 220).

Sneed's second CBWA placement was as a janitor at a YMCA.  (Tr. 229-35).  Sneed needed frequent prompting to stay on task and follow instructions during his shifts.  (Tr. 230, 231).  He stopped working "numerous times" to initiate conversation with his job coach, and he had difficulty managing his break time because he did not have a timepiece.  (Tr. 230).  During his second shift, Sneed's job coach made a task list to help him stay on task, but Sneed did not use it.  (Tr. 231).  During his fourth shift, Sneed had difficulty resuming work where he had left off after assisting with other tasks, but he was able to manage his breaks appropriately.  (Tr. 232).  During his last shift, Sneed was able to clean windows that "looked clean" to him, picked up trash around the grounds without prompting, and was able to pick up cleaning where he had left off after picking up trash.  (Tr. 233).  Overall, Sneed met 80% of employer expectations in his cleaning work, 60% of employer expectations in gardening work, and 60% of employer expectations in trash removal work.  (Tr. 229).  Sneed said that he enjoyed working as a janitor at YMCA.  (Tr. 232).

On August 3, 2016, BRV closed Sneed's vocational rehabilitation case. (Tr. 236-37).

Vocational Rehabilitation Counselor Dana Young explained that Sneed:

> Attempted one situational assessment and two work adjustments. Unfortunately, job development was not recommended at this time as you still exhibited a lack of job readiness. You are encouraged to continue with your counseling services to improve your stamina and work tolerances. You are also encouraged to pursue volunteering as a way to gather further experience and improve your skills. You are encouraged to work with your case manager and counselor to determine a good time to reapply in the future but may do so at any time.

(Tr. 236).

### E. Relevant Medical Opinion Evidence

### 1. Treating Social Worker – Shandi Rothman, LISW

On August 15, 2018, Rothman completed a "mental impairment questionnaire" evaluating Sneed's mental functional capacity. (Tr. 537-38). Rothman indicated that Sneed's anxiety impaired his ability to manage in social settings and that his mood disorder and ADHD contributed to struggles with cognitive functions (anger, distraction, poor focus, memory, and learning). (Tr. 537). Rothman indicated that Sneed had a limited ability to interact appropriately with the general public, ask simple questions, request assistance, accept instructions, and respond appropriately to criticism. (Tr. 538). He had a seriously limited ability to carry out short and simple instructions, manage regular attendance and be punctual within customary tolerances, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and maintain socially appropriate behavior. (Tr. 537-38). He was unable to carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, sustain an ordinary routine without special supervision, work in coordination with or in proximity to others without being distracted by them, complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent

pace without an unreasonable number and length of rest periods, remember locations and work-like procedures, understand and remember very short and simple instructions, understand and remember detailed instructions, and set realistic goals or make independent plans. (Tr. 537-38). Rothman further indicated that Sneed would be absent one day per week, be off task 30% to 40% of the workday, and need frequent prompting in order to stay on task. (Tr. 538).

### 2. State Agency Consultants

On January 31, 2017, state agency consultant Leslie Rudy, Ph.D., evaluated Sneed's mental functional capacity based on a review of his medical records. (Tr. 104-08). Dr. Rudy determined that Sneed had moderate limitations in understanding, remembering, and applying information; interacting with others; concentration, persistence, and maintaining pace; and adapting or managing himself. (Tr. 104). Sneed had moderate limitations in: understanding and remembering detailed instructions; carrying out detailed instructions; maintaining attention and concentration for extended periods; completing a normal workday and workweek without interruptions from psychologically based symptoms; performing at a consistent pace without an unreasonable number and length of rest periods; interacting appropriately with the general public; accepting instructions and responding appropriately to criticism from supervisors; getting along with coworkers or peers without distracting them or exhibiting behavioral extremes; and responding appropriately to changes in the work setting. (Tr. 106-07). Sneed was not significantly limited in any other function. (Tr. 106-07). On April 5, 2017, Robyn Murry-Hoffman, Ph.D., concurred with Dr. Rudy's findings except that Dr. Murry-Hoffman determined Sneed was "markedly limited" in his ability to interact appropriately with the general public. (Tr. 118, 120-22).

**F.     Relevant Testimonial Evidence**

Sneed testified at the ALJ hearing.  (Tr. 8-35).  Sneed testified that he spent time taking care of his dog, reading, and watching television with his grandmother.  (Tr. 25-26).  His chores included cleaning and taking out the trash.  (Tr. 23).  Sometimes Sneed had trouble keeping up with his hygiene, and he sometimes got sidetracked from or forgot to feed his dog, take out his dog, and do other chores until his grandmother reminded him.  (Tr. 23, 29-32).  ).  He did not usually run errands in the community, did not have any regular social activities, and did not drive.  (Tr. 9, 24).  Sneed left school in the tenth grade because he had problems focusing on his work, was in special education classes, and teachers would not help him.  (Tr. 10).  He had difficulty learning new tasks when he started jobs, and he had trouble with his BVR placements because the work was too fast-paced, and he got distracted by other people.  (Tr. 19, 28).  Sneed testified that his most significant issues were anxiety and ADHD, which caused difficulty focusing.  (Tr. 11).  Sneed indicated that his symptoms included difficulty being in crowded places like stores and restaurants, difficulty talking to other people, easy distraction, periods of major depression and high energy, crying spells, irritability, and difficulty sleeping.  (Tr. 12-13, 15-18, 20-21).  Sneed said that his medications helped "a little bit," and that this counseling also helped.  (Tr. 13-14).  He took ADHD medications when he was a child until they stopped working, and he indicated he would receive results from an adult ADHD assessment a month after the hearing.  (Tr. 14-15).  When he felt depressed or had an unstable mood, Sneed would isolate himself from others, read, and talk with his grandmother.  (Tr. 16).

**IV.    The ALJ's Decision**

The ALJ's October 11, 2018, decision found that Sneed was not disabled and denied his claim for SSI.  (Tr. 54-63).  The ALJ found that Sneed had the severe impairments of: "bipolar disorder; anxiety disorder; [ADHD]; borderline intellectual functioning, and obesity."  (Tr. 56).  The ALJ also determined that none of Sneed's impairments, singly or in combination, met or medically equaled a listed impairment under 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 57).  The ALJ found that Sneed had the RFC to perform a full range of work at all exertional levels, except that:

> The claimant is able to perform simple, routine, repetitive tasks in a work environment free from fast-paced production requirements and free of routine workplace changes; limited to having occasional contact with the general public and coworkers, and the contact claimant does have must be superficial, meaning that he cannot perform tasks involving arbitration, negotiation, confrontation, directing the work of others, persuading others, or being responsible for the safety or welfare of others; and requires weekly reinstruction on all job tasks (one time per week).

(Tr. 58).

In evaluating Sneed's RFC, the ALJ expressly stated that he "considered all symptoms" in light of the medical and other evidence.  (Tr. 58).  The ALJ specifically discussed Sneed's statements and records reflecting his depression, low energy, and anxiety.  (Tr. 59).  The ALJ noted that Sneed controlled his depression with medication and counseling and that his anxiety was generally focused on feeling that other people judged him in social situations.  (Tr. 59).  The ALJ also noted that Sneed "ha[d] been diagnosed with attention deficit hyperactivity disorder, and he ha[d] reported having problems with focus, attention, and following through since childhood."  (Tr. 59).  The ALJ noted that, although Sneed had some improvements in his ADHD with medication when he was a child, those improvements were not consistent.  (Tr. 59).  Further, the ALJ noted that Sneed had difficulty learning new things and needed frequent

reminders when working at his BVR placements, but that he was able to learn employers'
expectations about how to perform tasks. (Tr. 59).

The ALJ noted that, despite his limitations, Sneed was able to set goals for himself,
including his goal of getting a GED, and was able to perform tasks around and with people he
knew. (Tr. 60). The ALJ also noted that, while Sneed was not efficient, worked at a slow pace,
and was not social with others, he was able to learn how to perform tasks, met expectations, and
worked well with his coworkers. (Tr. 60). Moreover, the ALJ noted that Sneed had looked for
work, indicated that he enjoyed working, and appeared unsuccessful in his search for work due
mainly to his criminal history. (Tr. 60). Based on his review of the evidence, the ALJ found that
Sneed's "medically determinable impairments could reasonably be expected to cause the alleged
symptoms; however, [Sneed's] statements concerning the intensity, persistence and limiting
effects of these symptoms [were] not entirely consistent with the medical evidence and other
evidence." (Tr. 60).

The ALJ stated that the gave great weight to the Dr. Rudy's and Dr. Murry-Hoffman's
opinions, "partial weight" to Rothman's opinion, and "little weight" to the OOD opinion
evidence (the BVR reports and August 2016 letter from Young). (Tr. 60-61). Regarding the
BVR reports and Young letter, the ALJ noted that BVR closed Sneed's job services case because
he lacked job readiness based on the performance described in the BVR reports. (Tr. 61).
Nevertheless, the ALJ found that "a review of BVR's report indicates otherwise and that [Sneed]
would only need the requirements in the above [RFC] in order to work (a slower job with fewer
people and less distractions)." (Tr. 61).

Because Sneed lacked the ability to perform all or substantially all of the requirements of
work at any of the exertional levels, the ALJ relied on testimony from a vocational expert ("VE")

to determine whether Sneed would be able to perform any work in the national economy.  (Tr. 61-62).  Based on the VE's testimony, the ALJ found that someone with Sneed's age, experience, and RFC could "perform the requirements of representative occupations such as the following: (1) hand packager; (2) inspector and hand packager; and (3) cleaner, housekeeping." (Tr. 62) (citations omitted).  In light of his findings, the ALJ determined that Sneed was not disabled from September 30, 2016, through the date of his decision and denied the claim for SSI. (Tr. 62).

## V.  Law & Analysis

### A.  Standard of Review

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied 42 U.S.C. § 1383(c)(3); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  Substantial evidence is any relevant evidence, greater than a scintilla, that a reasonable person would accept as adequate to support a conclusion.  *Rogers*, 486 F.3d at 241; *Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 783 (6th Cir. 2017) ("Substantial evidence supports a decision if 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion' backs it up." (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971))).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence.  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).  If supported by substantial evidence and reasonably drawn from the record, the Commissioner's factual findings are conclusive – even if this court might reach a different conclusion or if the evidence could have supported a different conclusion.  42 U.S.C. § 1383(c)(3); *see also Rogers*, 486 F.3d at 241 ("[I]t is not necessary that this court agree with the Commissioner's finding, as

long as it is substantially supported in the record."); *Biestek*, 880 F.3d at 783 ("It is not our role to try the case *de novo*." (quotation omitted)). This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without being second-guessed by a court. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error."). Furthermore, the court will not uphold a decision, when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting Sarchet v. Charter, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-CV-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue*, No. 2:10 CV 017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010). Requiring an accurate and logical bridge ensures that a claimant, as well as a reviewing court, will understand the ALJ's reasoning.

The Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits: (1) whether the claimant is engaged in substantial

gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform his past relevant work in light of his RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy. 20 C.F.R. § 416.920(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). Although it is the Commissioner's obligation to produce evidence at Step Five, the claimant bears the ultimate burden to produce sufficient evidence to prove that he is disabled and, thus, entitled to benefits. 20 C.F.R. § 416.912(a).

### B.     Weighing of the OOD Opinion Evidence

Sneed argues that the ALJ failed to apply proper legal standards and reach a conclusion supported by substantial evidence in giving "little weight" to the BVR report. ECF Doc. 13 at 17-18. Specifically, Sneed contends that "the ALJ played doctor and made his own independent medical judgment" when he concluded that the BVR report supported the finding that Sneed could sustain employment if afforded the limitations described in the RFC. ECF Doc. 13 at 17-18. Further, Sneed asserts that the ALJ did not adequately "acknowledge or discuss" the consistency of the BVR report with other evidence in the record. ECF Doc. 13 at 17-18. The Commissioner responds that the ALJ reasonably gave "little weight" to the BVR report because, reading the ALJ's opinion as a whole, the BVR report's "extreme assessment" was at odds with: (1) his limited anxiety and bipolar disorder symptoms; (2) his ability to think, act, communicate, and adapt to changes and demands in his environment; and (3) his ability to perform tasks, meet certain performance expectations, and work well with coworkers. ECF Doc. 15 at 9.

In evaluating a claimant's RFC at Step Four, an ALJ should generally explain the weight given to opinions from nonmedical sources, such as social welfare agency personnel and rehabilitation counselors, if those opinions might have an impact on the outcome. SSR 06-3p, 2006 SSR LEXIS 5, at *4-5, 10 (Jan. 1, 2006)[3]; 20 C.F.R. § 416.927(f)(2) ("The adjudicator generally should explain the weight given to opinions from these sources . . . when such opinions may have an effect on the outcome of the case."). Such opinions may not be used to establish the existence of a medically determinable impairment, but they may be "valuable sources of evidence for assessing impairment severity and functioning" depending on the particular facts of the case. SR 06-3p, 2006 SSR LEXIS 5, at *5, 9; 20 C.F.R. § 416.927(f)(1) ("[T]he evaluation of an opinion . . . from a nonmedical source depends on the particular facts in each case."). In weighing a nonmedical source opinion, an ALJ may:

> consider such factors as the nature and extent of the relationship between the source and the individual, the source's qualifications, the source's area of specialty or expertise, the degree to which the source presents relevant evidence to support his or her opinion, whether the opinion is consistent with other evidence, and any other factors that tend to support or refute the opinion.

SSR 06-3p, 2006 SSR LEXIS 5, at *14; *see also* 20 C.F.R. § 416.927(f)(1). "[A]n ALJ has discretion to determine the proper weight to accord opinions from 'other sources.'" *Cuse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir. 2007).

As a preliminary matter, the court notes that Sneed's argument – that the ALJ "played doctor" by substituting his own lay judgment for the OOD's medical opinion – is unavailing and asks this court to apply a higher standard than the regulations require. *See* ECF Doc. 13 at 17-18. The OOD opinion evidence was not a medical opinion, as the agency personnel who

---

[3] The Commissioner rescinded SSR 06-3p for claims filed on or after March 27, 2017. *Rescission of Social Security Rulings 96-2p, 96-5p, and 06-3p*, 82 Fed. Reg. 15263 (Mar. 27, 2017). Because Sneed filed his claim on September 30, 2016, SSR 06-3p applies to his claim.

evaluated Sneed's vocational performance were not *medical* sources – acceptable or otherwise – under 20 C.F.R. § 416.927.  Instead, they were nonmedical sources who evaluated Sneed in their professional capacity and the weight due to their opinions was left to the sound discretion of the ALJ.  *Cuse*, 502 F.3d at 541; *see also* 20 C.F.R. § 416.927(f); SSR 06-3p, 2006 SSR LEXIS 5, at *4-5.  Moreover, the OOD opinion evidence generally evaluated whether Sneed was able to work (notably, in the specific contexts present at a Chili's restaurant and at a YMCA), rather than assessing his particular functional limitations.  *See generally* (Tr. 220-22, 229-37).  And whether a claimant is able to work – as an issue reserved to the Commissioner – is precisely the kind of matter upon which an ALJ is *required* to form his own opinion after considering the evidence in the record.  *See* 20 C.F.R. § 416.927(d)(1) (identifying "a statement by a medical source that [a claimant is] 'disabled' or 'unable to work'" as an opinion on an issue reserved to the Commissioner).

The ALJ applied proper legal standards and reached a conclusion supported by substantial evidence in evaluating the nonmedical opinion evidence from OOD.  42 U.S.C. § 1383(c)(3); *Rogers*, 486 F.3d at 241.  The ALJ complied with the regulations by stating that he gave the opinion "little weight."  SSR 06-3p, 2006 SSR LEXIS 5, at *4-5, 10; 20 C.F.R. § 416.927(f)(2); (Tr. 61)  The ALJ was not required to give "good reasons" for discounting the opinion as he would have been required to do if evaluating a treating medical opinion.  *Compare* 20 C.F.R. § 416.927(c)(2) (treating medical opinions), *with* 20 C.F.R. § 416.927(f) (other source opinions)  Nevertheless, the ALJ explained that the OOD opinion evidence was inconsistent with notes in the BVR reports reflecting that Sneed could work if he were limited to a slower job with fewer people and less distractions.  SSR 06-3p, 2006 SSR LEXIS 5, at *14; 20 C.F.R. § 416.927(f)(1); (Tr. 61).  Substantial evidence also supported the ALJ's conclusion, including:

(1) BVR notes indicating that Sneed was able to meet employer expectations, though his performance was inefficient and slow; and (2) Sneed's own comments to his job coach that he enjoyed the work he performed and believed he could work in similar positions with slower paced requirements, less exposure to people, and fewer distractions. *Rogers*, 486 F.3d at 241; *Biestek*, 880 F.3d at 783; (Tr. 220-22, 229-35).

Because the ALJ applied proper legal standards in evaluating the OOD opinion evidence, and the ALJ's reasons for discounting it were reasonably drawn from the record, the decision to give the opinion evidence "little weight" was within the Commissioner's "zone of choice." *Rogers*, 486 F.3d at 241; *Biestek*, 880 F.3d at 783; *Mullen*, 800 F.2d at 545. Accordingly, the court may not second-guess the ALJ's decision to give the OOD opinion evidence "little weight."

### C.    Weekly Reinstruction Finding

Sneed also challenges a single limitation included in the ALJ's RFC finding: that he "require[d] weekly reinstruction on all job tasks (one time per week)." ECF Doc. 13 at 14-17; *see also* ECF Doc. 10 at 62. Sneed argues that this finding "d[id] not accurately describe all of [his] limitations" because a "significant amount of evidence" shows that he "need[ed] frequent reminders or prompts to perform tasks in both the home and work settings." ECF Doc. 13 at 14 (emphasis omitted). Such evidence includes reports from Sneed's father, grandmother, and job coach/evaluator, as well as observations of his performance in "a sheltered work setting." ECF Doc. 13 at 14-16. Further, Sneed asserts that the ALJ's finding did not build an accurate and logical bridge between the evidence and the result because it understated his need for reinstruction by: (1) downplaying the frequency of his need for reinstruction; and (2) indicating that the necessary reinstruction could be scheduled on a weekly basis, when it actually arose

randomly.  ECF Doc. 13 at 15-17.  Thus, Sneed asserts the ALJ's finding that he "require[d] weekly reinstruction on all job tasks (one time per week)" was not a reasonable interpretation of the evidence.  ECF Doc. 13 at 17.

The Commissioner responds that the ALJ adequately considered the evidence in the record in assessing Sneed's RFC.  ECF Doc. 15 at 6-7.  Such evidence included findings that Sneed: (1) did not worry excessively; (2) was able to think, act, communicate, and adapt; (3) was able to effectively provide information to heath care providers; (4) learned how to perform tasks, met certain performance expectations, and worked well with coworkers; (5) could perform daily activities, including shopping, taking the bus, counting change, helping with household chores, reading on a Kindle, and watching television; and (6) enjoyed and actively sought employment.  ECF Doc. 15 at 6-7.  Further, the Commissioner asserts that the ALJ properly relied on Dr. Rudy's opinion – that Sneed had only moderate restrictions in his ability to understand, remember, or apply information; interact with others; maintain concentration, persistence, and pace; adapt and manage himself; carry out one-to-three step tasks in a setting without fast pace or high production; and was not significantly limited in carrying out short/simple instructions without special supervision.  ECF Doc. 15 at 7-8.  Finally, the Commissioner asserts that the ALJ properly noted that Sneed himself stated that his sex offender status – rather than his mental impairments – was the factor that damaged his ability to find employment.  ECF Doc. 15 at 6-7.

At Step Four of the sequential analysis, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence.  20 C.F.R. § 416.920(e).  The RFC is an assessment of a claimant's ability to do work despite his impairments.  *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p, 1996 SSR LEXIS 5 (July 2, 1996)).  "In assessing RFC, the [ALJ] must consider limitations and

restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" SSR 96-8p, 1996 SSR LEXIS 5.  Relevant evidence includes a claimant's medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant. 20 C.F.R. § 416.929(a); *see also* SSR 96-8p, 1996 SSR LEXIS 5.

The ALJ applied proper legal standards in determining that Sneed "require[d] weekly reinstruction on all job tasks (one time per week)." 42 U.S.C. § 1383(c)(3); *Rogers*, 486 F.3d at 241.  Here, the ALJ complied with the regulations by expressly considering all the evidence and all of Sneed's symptoms in evaluating Sneed's functional limitations.  20 C.F.R. §§ 416.920(e), 416.929(a); SSSR 96-8p, 1996 SSR LEXIS 5; (Tr. 58-61).  The ALJ's opinion discussed all the categories of evidence in the record: the notes from Sneed's BVR job coaches; medical opinion evidence; medical treatment and counseling notes regarding the effects of his depression, anxiety, limited intelligence, and ADHD on his ability to perform work, maintain focus and attention, and follow through; and the relevant testimony/function report statements.  (Tr. 59-61). Reading the ALJ's decision as a whole, the ALJ built a sufficient and logical bridge between the evidence upon which he relied and his conclusion that Sneed "require[d] weekly reinstruction on all job tasks (one time per week)."  (Tr. 59-61); *Fleischer*, 774 F. Supp. 2d at 877; *see also Buckhanon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678-79 (7th Cir. 2010) ("[W]e read the ALJ's decision as a whole and with common sense.").

Substantial evidence also supported the ALJ's conclusion that Sneed "require[d] weekly reinstruction on all job tasks (one time per week)," and was not more severely limited in his need for reinstruction.  42 U.S.C. § 1383(c)(3); *Rogers*, 486 F.3d at 241.  Such evidence included: (1) BVR job coach notes indicating that Sneed was able to learn his tasks, meet all or most of his employers' expectations, could manage his break time after he received a timepiece and training,

and was able to stay on-task or resume his tasks where he left off after training; (2) notes from Dr. Winkert, Dr. Shimer, and SWT Anderson indicating that Sneed had logical thought processes and no cognitive impairments (memory, concentration, and attention); (3) notes from LISW Rothman indicating that Sneed had logical thought processes; (4) treatment notes indicating that Sneed's symptoms and ability to focus on his goals and complete his chores improved with medication and counseling; (5) opinion evidence from the state agency consultants and notes from Dr. Shimer indicating that Sneed's concentration issues were only mild to moderate[4]; (6) Sneed's statement to Dr. Shimer that he did not have any ADHD symptoms in his adulthood; and (7) Sneed's statements/testimony that he played videogames or watched TV/movies for hours, read, and "felt mostly confident in being able to complete task list daily [when] tasks are broken down."  (Tr. 25-26, 104-08, 118, 120-22, 229-33, 262, 265, 268, 304, 351, 353, 360-62, 367-69, 371-74, 416-17, 423-24, 428-30, 467, 470,  483, 485, 487, 492, 497, 500-01, 508, 516, 521).  Further, Sneed's testimony, vocational records, and treatment records indicate that his concentration issues were generally related to his anxiety/distraction around other people and difficulty in meeting fast-paced requirements.  (Tr. 19, 28, 120-22, 222, 229-33, 359, 521). And those factors were specifically addressed by the ALJ's decision to limit his contact with other people and to set pace limitations in his RFC.  (Tr. 58).

Sneed is correct that other evidence in the record – including Kimbrough and William's function reports, BVR job coach notes indicating that Sneed needed frequent prompting, and Rothman and Dr. Shimer's notes finding Sneed had attention and concentration issues – could

[4] The court notes that the November 28, 2018, ADHD evaluation by Delphi Toth, Ph.D., indicated that: (1) Sneed had only a moderately severe impairment in attention and distractibility; and (2) his attention, focus, and memory issues were likely related to his other diagnoses rather than ADHD.  (Tr. 74-75). Nevertheless, Dr. Toth's post-decision evaluation is not relevant to this case because the Appeals Council determined it was immaterial and Sneed has not challenged that assessment.  (Tr. 46).

have supported a finding that Sneed's need for redirection was greater. (Tr. 220-22, 229-35, 261-68, 300-07, 483, 532). But, even if this court might have determined based on its own review of such evidence that Sneed *was* more severely limited in his need for reinstruction, the court is not permitted to decide these facts anew or reweigh the evidence. This is particularly so because the ALJ followed proper legal procedures and reasonably drew his factual findings from the evidence in the record. *Jones*, 336 at 476; *Rogers*, 486 F.3d at 241; *Biestek*, 880 F.3d at 783.

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, the ALJ's RFC finding – that Sneed "require[d] weekly reinstruction on all job tasks (one time per week)" – fell within his "zone of choice" and this court may not second-guess it. *Mullen*, 800 F.2d at 545.

## VI. Conclusion

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, the Commissioner's final decision denying Sneed's application for SSI is AFFIRMED.

**IT IS SO ORDERED.**

Dated: April 14, 2020

Thomas M. Parker
United States Magistrate Judge